Filed 12/1/22  P. v. Smith CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C091340 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CRF-DV-2017-0006269) |
| v. | |
| ALVIN R. SMITH, JR., | |
| Defendant and Appellant. | |

A jury found defendant Alvin R. Smith, Jr., guilty of several offenses stemming from an altercation with a former girlfriend and subsequent attempts to dissuade her from testifying against him.  On appeal, he faults two of his defense attorneys for depriving him of his constitutional right to counsel.  He argues pretrial counsel was ineffective for failing to properly relay a plea offer, and for improperly addressing the matter in a *Marsden*[1] hearing rather than a formal hearing to address counsel's ineffectiveness in

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

1

conveying the offer. He also claims his trial counsel provided ineffective assistance when he labored under an undisclosed conflict of interest due to his then-pending application for employment with the office of the district attorney and for failing to raise the proper objections to an expert's testimony regarding intimate partner violence and the prosecutor's reference to the expert's testimony in closing argument. Defendant contends that these errors individually and cumulatively deprived him of his right to a fair trial. At our direction, the parties have also addressed whether defendant's sentence is statutorily compliant, especially in light of recent amendments to sentencing statutes. We affirm the judgment, but agree that the trial court miscalculated the term on count 1. However, because we determine defendant is entitled to the benefits of recent legislative changes, and therefore remand the cause for a new sentencing hearing, the trial court may revisit the term imposed on count 1 at the new sentencing hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

Given the nature of the instant appeal, we briefly summarize the facts supporting the conviction. We will expand upon facts necessary for the resolution of each issue as we address them.

Defendant dated Jenny C. between December 2016 and May 2017. Starting in March, the nature of the relationship changed. Jenny and defendant began to argue, during which defendant "grabbed" her face and arms. Jenny had to check in with him "[e]very day," "[a]ll day," and if she did not answer the phone when he called, he would "come find [her]." Defendant also frequently demanded she stay home from work; when she did go to work, he often came to her place of employment demanding she leave. On at least one occasion, he threatened to "destroy the place if [she] didn't leave." Jenny changed her work schedule to "avoid drama" with defendant.

Jenny tried to end her relationship with defendant multiple times because "he would get so angry and try to control everything." But she admitted she always went back to him because she thought she loved him.

2

On May 4, 2017, Jenny spent the night with defendant; they went out and partied. The next morning, things "were fine" until she mentioned to defendant that she had to go to work. An argument ensued. When Jenny tried to pack up and leave, defendant took her belongings and threw each one across the room. Defendant hit Jenny in her face with her jeans and her purse, then pushed her to the couch. At some point during the altercation, defendant pinned Jenny on the bed, picked her up by her throat with her feet off the ground, pushed her to the far wall of his room, and then slammed her to the floor. Defendant then choked her. Jenny could not breathe and was scared.

Eventually, Jenny was able to run downstairs with her keys and get into her car. She left her phone, purse and other belongings in defendant's apartment. Defendant followed her in his car. Jenny drove to her mother's work and called 911. A recording of the 911 call was played for the jury.

A couple of days later, law enforcement spoke with Jenny about the incident with defendant. She still had neck pain and her back was "uncomfortable for a long time." She had a bruise on her chest and marks on her neck. Law enforcement took photographs of her injuries, copies of which were shown to the jury.

After defendant was arrested, a protective order was put in place while the criminal case was pending. Although Jenny knew defendant was not supposed to call her while he was in jail, she spoke with him many times over the phone, after he initiated calls to her from jail. They talked nearly every day and she spent hundreds of dollars on the calls. Sometimes when they spoke, the calls would be sweet and romantic. She admitted she wanted to hear from him and did not want him in jail; she still loved him. Other times, they would argue. Defendant got upset with Jenny when she did not answer his calls.

The jury heard clips of some of the recorded phone calls between defendant, Jenny and sometimes a third party. Defendant told Jenny several times to tell the district attorney that she would not testify, that nothing happened and she wanted to drop

3

everything. Defendant tried to convince her that if she did not appear, there was no evidence of his guilt. Defendant gave her some options, one of which was to lie and say that she had made everything up; that she was either drunk when it happened, or she was mad because she had found out he was cheating on her. He also told her, "Be smart and do whatever you gotta do to make sure this goes away. . . ." The jury heard several instances in which defendant complained to Jenny about the fact that he was still in jail and repeatedly told Jenny that she did not need to show up for the court dates, although the prosecutor told her the law required her presence. In response, Jenny told defendant she did not want him in jail and agreed to tell the prosecutor she was not going to testify.

Jenny did not appear as ordered, to testify against defendant at the preliminary hearing. At trial, Jenny testified that she was willing to disobey her subpoena and face an arrest warrant as a result. She also knew if she lied, she would get into trouble for filing a false report. In addition, she needed a restraining order against him in order to protect her children; she felt like her children were safe as long as defendant was in jail.

The prosecution also presented evidence on intimate partner violence from marriage and family therapist Richard Ferry. Ferry testified regarding, inter alia, the "myths and misconceptions" about domestic violence cases and the "cycle of violence." He did not testify regarding the specific facts of this case.

Pursuant to Evidence Code section 1109, the prosecution presented evidence of a number of prior acts of uncharged domestic violence defendant had allegedly committed against other women. One former girlfriend reported that defendant choked her. Another former girlfriend reported that he came to her workplace and threatened to "shoot [it] up" if she did not want to be with him.

4

The jury found defendant guilty of attempted corporal injury on a spouse/cohabitant (Pen. Code, §§ 664/273.5, subd. (a)) (count 1);[2] attempted false imprisonment by violence (§§ 664/236) (count 2);[3] dissuading a witness by force or threat from making a police report (§ 136.1, subd. (c)(1)) (count 3); dissuading a witness from testifying (§ 136.1, subd. (a)(2)) (count 4); and misdemeanor contempt of court for violating a protective order in a pending criminal procedure (§ 166, subd. (c)(1)) (count 5). The jury also found true the allegation that defendant used or threatened to use force on Jenny during the commission of count 3. Defendant initially admitted the additional allegation that he suffered a prior strike conviction (§§ 1170.12, subd. (b), 667, subds. (a) & (d)). However, the trial court subsequently granted his request to submit the allegation to a jury, which found it true.

The trial court sentenced defendant to a total of 18 years six months in state prison.

Defendant timely appealed.[4]

## DISCUSSION

### I

### *Ineffective Assistance of Pretrial Counsel*

Defendant raises several claims regarding a rejected plea offer, all based on the premise that his pretrial counsel provided ineffective assistance in failing to properly

---

[2] Undesignated statutory references are to the Penal Code.

[3] The jury found defendant guilty of the lesser included offenses in counts 1 and 2. Defendant was charged in count 1 with inflicting corporal injury to a spouse/cohabitant under section 273.5, subdivision (a) and in count 2 he was charged with false imprisonment by violence under section 236.

[4] The notice of appeal was filed on January 10, 2020. After multiple extensions of time granted as to both parties, the case was fully briefed and assigned to this panel on August 26, 2022.

5

convey to him, a plea bargain offer prior to trial. He argues that the *Marsden* hearing, in which this issue was discussed, was an inappropriate hearing in which to address the issue, and counsel was ineffective for failing to request a more formal inquiry into her ineffectiveness. Finally, he claims the trial court erred in telling defendant that the only remedy was to replace counsel. He requests this court order reinstatement of the plea offer. We disagree with defendant.

### A. *Additional Background*

The prosecution charged defendant with the following violations, and he therefore faced exposure to their associated prison sentences:

| | |
|---|---|
| Section 273.5, subdivision (a) | 2, 3, 4 years |
| Section 136.1, subdivision (a)(2) | 16 months, 2, 3 years |
| Section 136.1, subdivision (c)(1) | 2, 3, 4 years |

The prosecution also alleged that defendant had a prior strike, which, if admitted or proven, could potentially double the sentence. (§§ 667, 1170.12.) The nature of the charges, if convicted, would have limited defendant's ability to earn credit toward the service of his sentence such that he would have to serve at least 80 percent of his sentence. (§ 1170.12, subdivision (a)(5).)

Defendant was represented by various attorneys at different times in the criminal proceedings. At one point before trial, he was represented by the office of the public defender through attorney Vallado. He later retained an attorney, who withdrew before trial was scheduled. The office of the public defender was reappointed on October 25, 2017, and attorney Vallado was reassigned to defendant's case. On December 5, 2017, the day of trial, the court relieved attorney Vallado following a *Marsden* motion. The prosecutor then revoked all offers and trial was rescheduled.

6

At the *Marsden* hearing, defendant expressed two concerns with attorney Vallado: that she refused to file a motion pursuant to section 995 on his behalf and that Vallado failed to adequately communicate a plea bargain offer to him.

With respect to counsel's communication of the offer, defendant told the trial court that he and Vallado "may have had a miscommunication" about the offer, as he thought any proffered plea bargain required him to plead guilty to violating section 273.5. He said that Vallado was "telling me she offered me a 136 with four years, but in my mind and from what I've been writing down and all my notes and all my court paperwork and everything, the charges have never changed. So if I would have known this 136 with four years was going to be on the table, I would have negotiated that time." Defendant said that due to the issue with the plea offer and pretrial counsel's refusal to file a motion pursuant to 995, "my concern is, there's a lot of things in here that are I don't feel that me and her have communicated right with. [¶] Like I said, the 136 with four years, I'm not aware of that. I'm aware that it was 273.5, and I did not want -- I do not want that on my record."

Following further discussion, defendant reiterated, "If I would have known that 136 at four years could have been negotiated and there was more negotiations where I didn't have the 273 on my record, I wouldn't took it to trial. I wouldn't be here right now. I would be willing to work with the 136 and take a deal for that."

The court then asked for a response from Vallado. Vallado responded that defendant clearly stated he would not plead to a violation of section 273 so, at defendant's request, she attempted to negotiate a plea bargain where defendant would plead guilty to violating section 136 in exchange for a 12-month sentence. The prosecutor responded that probation was not an option; the bargain had to include a prison sentence. Vallado conveyed that to defendant but because defendant was retaining counsel to replace her, she discontinued negotiations.

7

After Vallado was reassigned to the case, she learned that there had been an offer to plead to a section 136 violation for four years, serving 80 percent of the sentence. When Vallado spoke with the prosecutor, she asked whether they could "reopen the 136 offer?"  The prosecutor agreed, for that day only, to offer a four-year sentence for defendant's plea to violating section 136.  Vallado said she "went back into the inmate box and I conveyed this to [defendant].  He did express to me the frustration of pleading to a DV when he said he never hit the woman, he never battered the woman.  I advised him specifically, the 136 is what he would be pleading to and not the domestic violence, so this issue is something he did not do that would not be an issue because we would be dismissing those charges.  I advised him the offer was four at 80 again.  He said he wasn't interested with that.  He asked me to convey a counteroffer of two years and to hold sentencing over so he would basically be paper paroled.  [¶]  We set this trial and it came back for further pretrial conference, at which time I conveyed the offer to [the prosecutor].  Again, she said no to that offer.  [¶]  I went back into the inmate box and conveyed that to [defendant].  I said, 'Do we want to resolve it for four years or are we going to trial?'  And he said he wanted to confirm the trial."

Defendant responded that during that conversation, he was under the impression that the charge involved was section 273 and that counsel did not mention it was for a section 136 violation.  Defendant then stated that this problem with communication resulted in a breakdown in his relationship with Vallado.

Vallado said, "I think what the issue he's trying to say that I didn't properly advise.  And I don't know what to do to other than to give him an opportunity for a hearing to see whether or not he thinks I provided ineffective assistance or not.  That's why I said the best way to address this is in a *Marsden*."  Defendant agreed, stating, "I do feel she didn't advise me. . . .  I feel things would have been different and a different route if I would have known different information."  Pretrial counsel reiterated that she

8

"specifically recall[s] telling him that if he's concerned he was pleading to a battery, nobody was asking him to plead to that."

The trial court told defendant that the district attorney made very clear that the offer of four years is not going to come back. The court asked whether defendant thought Vallado could effectively defend him at trial. Defendant answered in the negative, stating that he could no longer work with Vallado given the problems in communication. The trial court then asked defendant, "You're saying that your relationship is broken down so dramatically that you do not trust your counsel?" Defendant replied, "That's correct." The trial court then asked: "And you cannot work with her?" to which defendant responded, "That's correct, yes, sir."

The trial court then granted the *Marsden* motion. After brief representation by private counsel, trial counsel Wilding was appointed and represented defendant at trial.

*B. Analysis*

*1. Counsel was Not Ineffective for Requesting a Marsden Hearing*

Defendant claims Vallado should have advised the trial court that defendant claimed she was ineffective in failing to communicate a plea offer and thus created a conflict. We find Vallado did do just that. She requested a *Marsden* hearing and during the hearing Vallado told the court, "I think what the issue he's trying to say that I didn't properly advise. And I don't know what to do to other than to give him an opportunity for a hearing to see whether or not he thinks I provided ineffective assistance or not. That's why I said the best way to address this is in a *Marsden*." Defendant made clear during the hearing that he perceived a breakdown in communication leading to an irreconcilable conflict such that replacement counsel was warranted. "When the trial court knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel, it is required to make inquiry into the matter." (*People v. Bonin* (1989) 47 Cal.3d 808, 836.) Here, the trial court made such inquiry.

9

On appeal, defendant alleges that the *Marsden* hearing held in the trial court, was "not the 'best way' to address" the issue of whether counsel had adequately communicated to him a plea offer of four years on a section 136.1 charge. We disagree. A criminal defendant has a constitutional right to counsel at all critical stages of a criminal prosecution. (*Mempa v. Rhay* (1967) 389 U.S. 128, 134-137; *People v. Doolin* (2009) 45 Cal.4th 390, 453 (*Doolin*).) To safeguard this right, a defendant represented by an appointed attorney may request that the court discharge the attorney and substitute new counsel on the basis that the defendant's right to counsel would be substantially impaired by continuing with the original attorney. (*Marsden, supra*, 2 Cal.3d at p. 123; *People v. Smith* (1993) 6 Cal.4th 684, 694; see also *People v. Martinez* (2009) 47 Cal.4th 399, 419 [*Marsden* was intended to provide protection to the right to counsel].) This request may be made at any stage in the criminal proceedings and the court must conduct a hearing, known as a *Marsden* hearing. (*People v. Sanchez* (2011) 53 Cal.4th 80, 89.) During this informal hearing, " 'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' [Citations.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) Thus, the trial court is obligated not merely to inquire into a possible conflict of interest, but to act in response to what its inquiry discovers. In fulfilling its obligation, it may make arrangements for representation by conflict-free counsel. (See *People v Bonin, supra*, 47 Cal.3d at p. 837.)

That is what occurred here. When the trial court held the *Marsden* hearing in this case, it afforded defendant full opportunity to express his dissatisfaction with Vallado, including the fact that he believed that she failed to communicate the plea offer he wanted. (See *People v. Sanchez, supra*, 53 Cal.4th at pp. 89-90 [trial court must conduct a hearing, permitting a defendant to air his complaints regarding trial counsel's efficacy

10

and further representation, and was required to determine whether these complaints warranted substituting counsel].)  Further, the trial court found defendant's complaints regarding the conflict warranted removal of counsel under *Marsden*.  Upon relieving Vallado, new counsel was substituted for all purposes.  (See *Sanchez*, at p. 88.)

While defendant alleges on appeal that the trial court should have appointed new counsel to develop the ineffective assistance of counsel claim and thus reinstate the previous plea offer, he *did* get new counsel, who was free to pursue any claims that defendant felt were unresolved, including the issue with communication of the previous plea offer.  We note also that, at least on the record before us, defendant *never asked* to have the plea offer reinstated, either before Vallado was removed, during the *Marsden* hearing, or even after Vallado was removed, despite having new counsel to explore such a request.  It is only here on appeal that he makes such request.

Applying the above principles, we disagree that pretrial counsel, Vallado, was ineffective for requesting a *Marsden* hearing for purposes of discussing whether she adequately relayed a plea offer.  As discussed above, a *Marsden* hearing must be held when defendant seeks permission to substitute counsel based on inadequate representation or when an irreconcilable conflict arises.  Here, defendant sought new counsel based on both bases:  He asserted that counsel was inadequately representing him by failing to file a motion pursuant to section 995 and by failing to adequately communicate a plea offer, and asserted that because of the communication problems regarding the plea offer, an irreconcilable conflict developed through a breakdown in communication and trust.

Thus, contrary to defendant's claims, counsel was not ineffective for requesting a *Marsden* hearing.

### 2. *Lafler Remedy*

Defendant asserts that Vallado was ineffective in failing to adequately communicate the offer of 4 years on a section 136.1 charge.  He claims, in essence, that

11

because counsel failed to relay the plea offer, a more formal hearing should have been held, after which, the prosecutor would have to reinstate the plea bargain offer in order to neutralize the taint of counsel's ineffective representation, as provided in *Lafler v. Cooper* (2012) 566 U.S. 156, 170-171. Instead, he claims, the trial court misadvised him by telling him "the offers are not going to come back." Again, we disagree.

In *Lafler*, the United States Supreme Court held the proper remedy for a defendant who rejected a plea offer because of ineffective assistance of counsel depended upon the situation that resulted in counsel's ineffective assistance. In that case, the proper remedy was to order the People "to reoffer the plea agreement," after which the court could exercise its discretion to determine "whether to vacate the convictions and resentence [defendant] pursuant to the plea agreement, to vacate only some of the convictions and resentence [defendant] accordingly, or to leave the convictions and sentence from trial undisturbed. [Citation.]" (*Lafler v. Cooper, supra*, 566 U.S. at p. 174.)

As mentioned above, defendant's statements at the hearing on his *Marsden* motion did not include any request for the plea offer to be reinstated, or for any other hearing to pursue such remedy. Defendant has not cited to—and we are unaware of—any authority that a court has a sua sponte duty to hold an evidentiary hearing to determine whether the People should be ordered to re-offer a previous plea offer. During the *Marsden* hearing, defendant did not ask the court to do anything other than determine whether Vallado could effectively represent him. As previously noted, defendant's *Marsden* motion was granted, the court removed counsel based on the conflict and new counsel was appointed for all purposes going forward. If defendant also sought to establish attorney Vallado's ineffectiveness for failing to communicate the plea offer so that he could obtain relief under *Lafler*, he should have said so. This claim could have been raised prior to trial or in a motion for new trial. (See *In re Alvernaz* (1992) 2 Cal.4th 924, 944.) Defendant's failure to do so forfeits the issue on appeal. " ' " 'The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the

12

trial court, so that they may be corrected or avoided and a fair trial had . . . .' "
[Citation.]' " (*People v. Simon* (2001) 25 Cal.4th 1082, 1103.)  A constitutional right
may be forfeited in criminal as well as civil cases by the failure to make timely assertion
of the right before a tribunal having jurisdiction to determine it.  (*Ibid.*)  That principle
applies here.[5]

## II

### *Ineffective Assistance of Trial Counsel*

Defendant also claims that trial counsel was ineffective when he silently labored
under a conflict of interest created by his pending employment application with the office
of the district attorney.  Defendant further asserts that trial counsel's performance was
ineffective when he failed to properly address evidence regarding intimate partner
violence and the prosecutor's use of such evidence during closing argument.

A.  *Expert Testimony*

Prior to trial, the prosecutor sought to present expert testimony from Richard Ferry
on "the Effects of Intimate Partner Battering."  At the hearing on the motion in limine,
the prosecutor explained that the information was relevant to explain how "victims act as
a class," such as refusing to testify, minimizing the event or recanting.  The prosecutor
argued that Ferry's testimony would help explain to the jury why a victim of domestic
violence might act in such a way; Ferry would not provide any opinions specific to
defendant's case.  The prosecutor also indicated that she had provided defense counsel
"with some materials, educational materials provided by Mr. Ferry to give an idea of

---

[5]  To the extent there exists a claim of ineffective assistance of counsel for new counsel's
failure to raise the issue or any other claim resting on information found outside the
record, such a claim must necessarily be raised in a habeas corpus petition.  (See *In re
Alvernaz, supra*, 2 Cal.4th at p. 944.)

13

what he would be testifying to." Over defense counsel's objection, the court ruled the evidence admissible.

At trial, Ferry testified that he was a marriage and family therapist and often gave expert testimony in domestic violence cases in order to educate juries regarding common reactions of people in a violent intimate relationship. He explained that he was not aware of any of the specific facts of defendant's case and had not reviewed any of the evidence. He then gave general testimony about the effects of intimate partner battering including the cycle of violence and the frequency of recantation by victims of domestic abuse. He also stated that "without intervention, the violence becomes worse, it becomes more frequent over time. So it might have been door slamming, dish breaking once a year in 15 years without any intervention. It can get to serious medical damage." Ferry further testified that in his experience, "a quarter or less of abusers who don't need to be in therapy. They don't need to be in a 52-week batterer's intervention program. They can do well."

At one point, the prosecutor asked whether it was always true that a grown woman would refuse to do something her partner asked her to do, when that request was against her best interest and the partner was in jail? Ferry explained that there were two possible reasons why a woman might do as asked in that situation: (1) because doing so is simply pragmatic or (2) "through the phenomenon known as traumatic bonding, or the Stockholm syndrome, where the person who is receiving the abuse takes on the values and beliefs and preferences of the abuser and sort of excludes their own values, beliefs and preferences in order to be psychologically closer to the abuser, be similar to the abuser, and thereby, gain a level of protection." Ferry said that "[t]his phenomenon shows up in cults, . . . among children who are battered and prefer to remain with the batterer than go somewhere else. [¶] It has also shown up among hostages . . . [a]nd among prisoners of war, and . . . it also was observed among some individuals who were Jewish caught up the Holocaust who were in camps . . . . So that's a very extreme

example of traumatic bonding."

After the close of evidence, the trial court instructed the jury based on CALCRIM No. 850: "You've heard testimony from Richard Ferry . . . -- LMFT -- regarding the effect of intimate partner battery. Mr. Ferry's testimony about intimate partner battery is not evidence that the defendant committed any of the charges against him . . . . You may consider this evidence only in deciding whether or not Jenny [C.]'s conduct was not inconsistent with the conduct of someone who has been abused or in evaluating the believability of her testimony."

During closing argument, the prosecutor told the jury to pay attention to the jail calls between defendant and Jenny, as they show defendant's consciousness of guilt and that he is doing everything he can to get "off the hook." Highlighting defendant's purported history of domestic violence, the prosecutor argued that the evidence regarding what happened to defendant's other girlfriends is important because "it shows that Jenny didn't just make all this up. [¶] . . . [¶] And the law allows us to consider that in the jury instructions. It will say, if you believe these prior incidents, you may use that to conclude that it's likely he did it in this case. Well, why is that? Because either you're the kind of guy who beats up your girlfriend and strangles your girlfriend or you're not. And if you're the type of guy that does that, you're going to do it again and again, to girlfriend after girlfriend. [¶] Just like Mr. Ferry explained to us, domestic violence without intervention does not stop. It just keeps escalating and getting worse and more pervasive."

Defendant contends counsel provided ineffective assistance when counsel failed to "define and limit" the scope of Ferry's testimony before it was given and failed to object to the testimony when it went beyond permissible boundaries and instead became "negative character / profile evidence that typical abusers repeat the abuse, become more

15

violent, and will continue to abuse their partners until stopped." Thus, defendant does not dispute the admissibility of the expert's testimony,[6] just how it was used at trial.

To establish ineffective assistance of counsel, a defendant must show both deficient performance under an objective standard of professional reasonableness, and prejudice under a test of reasonable probability of a different outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Grimes* (2016)1 Cal.5th 698, 734-735.) To establish the first element, a defendant must overcome the general presumption that counsel acts competently. (*People v. Brown* (2014) 59 Cal.4th 86, 109; see also *Strickland*, at p. 694.) There is no need to consider whether counsel's performance was deficient when an ineffective assistance of counsel claim can be resolved on lack of prejudice grounds. (*Strickland*, at p. 697.)

Prior to trial, the limitations of Ferry's testimony were defined; Ferry could, and did, testify to the general issues and common behaviors seen in relationships involving intimate partner violence. The court's limiting instruction based on CALCRIM No. 850 told the jury that Ferry's testimony was not evidence that defendant committed any of the charges against him but that it could be considered in deciding whether Jenny's conduct was not inconsistent with the conduct of someone who has been abused or in evaluating the believability of her testimony. Without evidence to the contrary, we presume the jury followed this instruction. (See *People v. Delgado* (1993) 5 Cal.4th 312, 331.) Finally, although there is no requirement that the court give any limiting instruction before

---

[6] The expert testimony was admitted pursuant to Evidence Code section 1107 which states, in part: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a).)

16

Ferry's testimony,[7] we note that Ferry explained early in his testimony that he was not testifying as to anything case-specific, but rather to educate the jury on common myths and dynamics within the cycle of violence that may explain certain behaviors from those experiencing intimate partner abuse. Thus, counsel was not ineffective for failing to seek to further define the scope of the expert testimony.

Nor do we agree that trial counsel was deficient for failing to otherwise seek to limit Ferry's testimony. Specifically, defendant faults trial counsel for failing to object to Ferry's vivid examples of where the phenomenon of traumatic bonding "shows up," such as in cults, prisoners of war, and Holocaust survivors, arguing that these examples are negative character attacks on defendant and the witnesses who provided evidence pursuant to Evidence Code section 1109. However, Ferry admitted that those examples were "extreme." While they call to mind historical events that may provoke discomfort, defendant does not argue that they are inaccurate examples of "traumatic bonding." Additionally, the prosecutor did not use any of Ferry's "extreme examples" in closing arguments. Any implication that Ferry's examples referred to defendant or somehow bolstered the testimony of the witnesses who testified about defendant's prior acts of domestic violence was dispelled by the trial court's instruction with CALCRIM No. 850, as discussed *infra*, when the trial court instructed the jury that it may only consider Ferry's testimony in evaluating Jenny's conduct and testimony. Finally, even if counsel should have objected to these extreme examples, there may have been a strategic reason to refrain from doing so, especially since objecting would have called the jury's attention to the testimony.

---

**7** (See *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1071 [as a general matter, the trial court owes no sua sponte duty to give the instruction]; see also *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088, fn. 5 [clarifying instruction on use of evidence of battered women's syndrome might be appropriate *on request*].)

17

Defendant further contends that trial counsel should have objected to Ferry's descriptions of typical abuser behavior and mindset as inflammatory, because they essentially described defendant. Yet at no point did Ferry suggest he was describing defendant or any other witness involved in this case. A licensed marriage and family therapist specializing in the area of domestic violence, Ferry testified that he had been licensed to work in the field since 1979, regularly completes continuing education, is familiar with research on the subject, and based his testimony on such research and his experience. He testified that he knew nothing about the facts of this particular case, had never met Jenny or defendant, and had not read any reports or listened to any jail calls relating to this case. He made it clear that he was not rendering an opinion about whether defendant committed the alleged acts or whether they even occurred.

Defendant argues that Ferry's testimony "predict[ed]" that defendant not only abused Jenny but would continue to do so in the future when Ferry testified that only a quarter or less of abusers would stop without intervention. In support of this claim, defendant cites to *People v. Julian* (2019) 34 Cal.App.5th 878, in which the court concluded that statistical probability evidence in the context of child sexual abuse accommodation syndrome (CSAAS) improperly invited jurors to presume the defendant was guilty.

We disagree that *Julian* establishes that Ferry's testimony prejudiced defendant. In *Julian*, the prosecution's expert psychologist testified at length, without objection, concerning specific percentages of false allegations made by children in 12 studies. (*People v. Julian, supra*, 34 Cal.App.5th at pp. 883-887.) The appellate court determined that defense counsel provided ineffective assistance of counsel by not objecting to the statistical evidence. Noting the weak prosecution evidence and comparatively strong defense evidence, the court explained: "[The expert's] statistical evidence tipped the scales in favor of the People based on statistical studies that were irrelevant to the issue of Julian's guilt or innocence. It distracted the jury from its duty to decide the properly

18

admitted evidence.  [Citation.]  Such evidence may not be prejudicial where it occurs in a slight passing reference by the expert.  But here the jury was bombarded with it." (*Id*. at p. 888.)

Unlike the wide-ranging statistical evidence in *Julian*, this case included only minor references to statistics.  Moreover, the brief reference to Ferry's own experiences in which a quarter or less of abusers do not need to be in therapy to stop the abuse did not tell the jury that defendant was definitively one of the others who do need intervention to stop from abusing.  Nor did Ferry's testimony ask the jury to take such a conclusive leap.  Rather, Ferry's testimony was limited to explaining the dynamics in an abusive relationship as a factor in determining Jenny's credibility in light of her continued association with defendant and her inconsistent cooperation with the prosecution.  As discussed further *post*, if any evidence presented by a third party suggested that defendant was likely to have committed the charged offenses, it was his own prior acts of domestic violence against former girlfriends.

In light of the above, we conclude that counsel's purported failure to "define and limit" Ferry's testimony did not amount to deficient performance.

### B.  Conflict of Interest

After trial, a new attorney was assigned to defendant's case for posttrial matters.  Posttrial counsel filed a motion for a new trial, alleging that defendant was denied effective assistance of counsel when his trial counsel labored under a conflict of interest because he was "entertaining the possibility of being hired [as] a deputy District Attorney in San Joaquin County" and "[i]t is believed that at the time of the trial, he had already applied for employment with the office."  Posttrial counsel also identified several "errors" by trial counsel, alleging that those errors resulted from the conflict.  One of the errors identified was the allegation that trial counsel did not conduct voir dire of Ferry and failed to challenge the relevancy of the subject matter of the expert's testimony.

19

In response, the People argued that no actual conflict existed and stressed that there was no evidence that trial counsel's employment application had any effect on his representation of defendant at trial. The People addressed each of the "errors" perceived by defendant and argued that counsel's performance was not constitutionally defective. In particular, the People argued that Ferry was clearly qualified to testify as an expert and any voir dire by trial counsel would have had no impact on the outcome of the trial. The People further argued that Ferry's testimony was relevant and admissible to explain why a victim would resume a relationship with a defendant after being violently assaulted by him and even agree to lie or not come to court in order to help defendant.

At the hearing on the motion for new trial, the court heard argument from counsel, including on the conflict of interest claim, and denied the motion for new trial. The court noted that there was "overwhelming evidence" of defendant's guilt and that trial counsel objected when appropriate during trial.

A claim of conflict of interest constitutes a form of ineffective assistance of counsel. (*Doolin, supra*, 45 Cal.4th at p. 417; *id*. at p. 419 ["Under our state Constitution, the right to counsel includes the correlative right to conflict-free representation"]; *People v. Mai* (2013) 57 Cal.4th 986, 1009-1010 ["[A] claim of conflicted representation is one variety of claim that counsel provided ineffective assistance"].) "In order to demonstrate a violation of the federal and state Constitutions based on a conflict of interest, a defendant must show that his or her counsel was burdened by an 'actual' conflict of interest—one that in fact adversely affected counsel's performance. (*Doolin*, at p. 421 ['[T]he high court's analysis of Sixth Amendment conflict of interest claims has evolved into one of ineffective assistance of counsel, which requires a defendant to show counsel's deficient performance and a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different'].)" (*People v. Perez* (2018) 4 Cal.5th 421, 435.)

20

"An actual conflict of interest means 'a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties.' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 309.) Determining whether counsel's performance was "adversely affected" requires an inquiry into whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. In undertaking such an inquiry, we " 'must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' [Citation.]" (*Doolin, supra*, 45 Cal.4th at p. 418.)

Applying these principles, we conclude defendant demonstrates none of the required factors.

Here, there was no actual conflict. A defense attorney does not create "a conflict of interest merely by seeking employment with the district attorney's office or even by campaigning to assume that office while continuing to represent criminal defendants. (*People v. Marshall* [(1987)] 196 Cal.App.3d [1253,] 1257 [defense counsel's acceptance of employment with district attorney does not require finding of actual conflict of interest].) Any conflict between an attorney's personal interest in obtaining employment and his or her client's interest in loyal and effective representation is too attenuated to impute a violation of professional ethics in each such case." (*People v. Clark* (1993) 5 Cal.4th 950, 996-997, disapproved on other grounds in *Doolin, supra*, 45 Cal.4th 390.) Because a pending employment application did not create a conflict of interest, we reject defendant's claim that trial counsel was ineffective for failing to disclose the pending application.

Contrary to defendant's claim, *Daniels v. Woodford* (9th Cir. 2005) 428 F.3d 1181 does not stand for the proposition that the mere fact that trial counsel submitted an employment application with the office of the district attorney created an actual conflict

21

of interest. Rather, the conflict in *Daniels* was created by a series of events that occurred. In particular, certain decisions of the state trial court regarding the selection and removal of counsel led the Ninth Circuit to conclude that by the time of trial, the defendant's "lack of trust and confidence in his defense counsel's motives resulted in a total lack of communication," constructively denying him effective assistance of counsel. (*Id*. at pp. 1191; see *id*. at p. 1197.) These events included the refusal by the public defender's office to recognize a "clear" conflict created by the office's representation of Daniels in a prior case in which a deputy public defender simultaneously engaged in negotiations with the district attorney's office for Daniels' plea and—acting in his own interest—for a position within the same district attorney's office. This led to another series of events where Daniels was remanded to immediate custody instead of the agreed upon rehabilitation program. (*Id*. at p. 1188.) Here, in stark contrast, there is no evidence that trial counsel's pending employment application led to events that prejudiced defendant in any way.

Defendant does not argue that the conflict itself affected counsel's performance such that counsel failed to represent defendant as vigorously as he might have, had there been no conflict. (*Doolin, supra*, 45 Cal.4th at p. 418.) Instead, defendant claims that trial counsel's performance was ineffective when he failed to properly address expert testimony regarding intimate partner violence as well as the prosecutor's use of such evidence during closing argument. Regardless of whether we analyze these subsequent claims as prejudice stemming from the purported conflict or as independent instances of deficient performance, we disagree that trial counsel was constitutionally ineffective.

*C. Prosecutor's Closing Argument*

Finally, defendant claims that trial counsel was ineffective for failing to object to the prosecutor's closing argument. He claims that when the prosecutor argued that Ferry explained that domestic violence without intervention would keep escalating and get worse, he impermissibly told the jury that it could consider Ferry's testimony as evidence

22

that defendant would, unless stopped, commit similar and increasingly worse crimes.  We disagree with this interpretation.

To the extent that defendant argues that the prosecutor engaged in misconduct, he has forfeited this claim by failing to raise a timely objection in the trial court on this ground.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1350.)

The prosecutor's comment at issue followed, and was made within the context of, a discussion about the evidence admitted pursuant to Evidence Code section 1109.  The prosecutor noted that the evidence regarding other instances of domestic violence, if believed by the jury, could be considered as propensity evidence.  The prosecutor went on to argue, essentially, that this type of propensity evidence helps establish whether a person is the type who beats up his girlfriend and, if so, that person will do it again and to more than one girlfriend.  The prosecutor then stated, "Just like Mr. Ferry explained to us, domestic violence without intervention does not stop.  It just keeps escalating and getting worse and more pervasive."

Contrary to defendant's claim, the prosecutor did not encourage the jury to use Ferry's testimony as proof that defendant was abusive.  Rather, the prosecutor explained that the jury could consider defendant's own prior instances of domestic violence as evidence that defendant was disposed or inclined to commit further acts of domestic violence and that he likely committed the charged acts of domestic violence against Jenny because the law recognized the substance of part of Ferry's testimony:  that there is often a general pattern of abuse that follows the perpetrator from relationship to relationship, escalating and becoming more pervasive if not interrupted.  This was consistent with CALCRIM No. 852A, with which the jury was instructed.

Defendant argues Ferry's testimony went beyond the permissible scope of expert testimony under Evidence Code section 1107 when he "testified by implication that [defendant] was not only probably guilty of domestic violence, but would also commit increasingly violent crimes against his domestic partners in the future unless stopped."

23

He likens his case to *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64 (*Clotfelter*) in which the appellate court concluded there was no tactical reason for defense counsel to refrain from objecting to the prosecutor's closing argument telling the jury it could use CSAAS evidence to infer that the complaining witnesses were actually victims of the crimes charged.

Defendant's reliance on *Clotfelter* is misplaced. In *Clotfelter*, the defendant was charged with, and convicted of, several offenses involving inappropriate behavior with 14- or 15-year-old boys. Although it was undisputed that Clotfelter had developed close connections with the boys and their families, there was a dearth of direct evidence that Clotfelter was sexually inappropriate with the boys. (*Clotfelter, supra*, 65 Cal.App.5th at pp. 60, 64-65.) All of the boys testified that Clotfelter never did anything inappropriate, and the parents of the respective boys also said they saw nothing alarming with Clotfelter's behavior. (*Id*. at pp. 39, 42-43, 64-65.) In contrast, the prosecution presented an expert who testified regarding CSAAS, a clinical psychologist who opined that a hypothetical person with the exact same history as Clotfelter has " 'either reoffended or is close to reoffending.' " (*Id.* at p. 61.) On appeal, the appellate court was troubled by the scope of the expert testimony produced by the prosecution. The court concluded that the psychologist's testimony in answering the hypothetical was "equivalent to testifying that Clotfelter had the requisite mental state and was guilty (or about to be guilty) of the charged offenses." (*Ibid*.) Finally, the court determined that because the case did not involve victims who delayed reporting abuse or a retraction of an accusation, indeed, there was no allegation of abuse, it was not at all apparent that the CSAAS testimony was relevant. (*Id*. at pp. 64-65.) The court stated that "the jury cannot be led to engage in the leap from: (1) many victims of sexual abuse do not disclose the abuse because they hold the abuser in high esteem; (2) the witness failed to disclose the sexual abuse; (3) the witness exhibits the same behavior as a class of actual victims of sexual abuse; therefore, (4) the witness was in fact sexually abused." (*Id*. at p. 64.) Yet

24

the court determined that this is precisely the argument that the prosecutor was making to the jury: that it could use the CSAAS testimony to infer that the boys were actual victims despite the fact that none of them ever disclosed or testified to any inappropriate behavior. (*Ibid*.)

Finding certain expert testimony impermissible, the appellate court concluded that counsel was ineffective for failing to object to, or move to strike, the expert testimony, the improper use of CSAAS evidence, and the repeated instances of inflammatory testimony. In light of the lack of direct evidence of sexual impropriety, the court concluded it was reasonably probable that defense counsel's errors taken together affected the outcome of the case and rendered the result of the trial unreliable and fundamentally unfair. (*Clotfelter, supra*, 65 Cal.App.5th at pp. 69-70.)

The instant case is wildly different than *Clotfelter*. Here, Jenny reported the abuse the same day and was later interviewed by a police officer. Although Jenny later became less willing to participate in the prosecution's case against defendant, this presented a credibility issue rather than a lack of evidence of criminal behavior as was at issue in *Clotfelter*. Unlike the use of CSAAS evidence in *Clotfelter*, Ferry's testimony regarding intimate partner violence evidence was not used to supply evidence of defendant's mental state or criminal behavior. Defendant's jury was never called upon to infer Jenny was abused by defendant based solely on Ferry's description of the demeanor or characteristics of most domestic violence victims or abusers. Rather, if the jury believed Jenny's account of the incident and defendant's stated intent during the phone calls to Jenny while the case was pending, such evidence supported the findings of guilt even without consideration of Ferry's evidence.

Because the prosecutor's use of Ferry's testimony did not invite the jury to use Ferry's testimony as evidence that defendant committed the acts of violence and would continue to do so, the record does not support a conclusion that counsel's performance was deficient in failing to object to the prosecutor's comments.

25

*D. Prejudice*

Even were we to find that counsel should have disclosed the pending employment application, or objected to the scope of Ferry's testimony and/or the prosecutor's comment on Ferry's testimony, we discern no resulting prejudice as there is no reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*Strickland v. Washington, supra*, 466 U.S. at pp. 687-688, 693-694.) This was not a close case; the evidence against defendant was strong. Jenny testified to defendant's controlling behavior that escalated over time, reaching its zenith when defendant grabbed her by her throat, pinning her to the bed, the wall and then the floor. He tried to keep her from leaving his apartment and prevented her from using her phone. Jenny had pictures of the resulting bruises. After defendant was arrested, in violation of a protective order, he called Jenny multiple times to dissuade her from testifying. The jury heard several recorded portions of phone calls in which defendant expressed his dissatisfaction that he was still in jail and urged Jenny to say that she lied about the incident or "do whatever it takes" to get the case to go away. These phone calls undoubtedly bolstered Jenny's credibility regarding defendant's controlling behavior, which in turn bolstered Jenny's account of the physical attack. In addition, the jury heard defendant's ex-girlfriends report similar behavior by defendant, including his attempt to control their work schedules and choking at least one of them. The jury could have considered the evidence from former girlfriends as rendering it more likely that defendant committed the charged acts upon Jenny. In light of this strong evidence, there is no indication that counsel's purportedly missed objections made any difference in the outcome of the trial.

## III

### *Sentencing*

At our direction, the parties have addressed whether, in light of recent legislation, defendant's sentence is correct. The parties agree that the trial court miscalculated one

count such that the sentence on count 1 should be reduced from 18 months to 12 months. Although the People acknowledge that the recent amendments apply retroactively to defendant, they disagree that resentencing is required. The People argue that because the trial court imposed the upper term based on defendant's recidivism, any error in the trial court's reliance on unproven prior convictions was harmless beyond a reasonable doubt. Defendant contends we must remand the matter to permit the trial court to reconsider the entirety of his sentence. We agree that remand is required.

### A. Additional Background

Defendant requested that the trial court dismiss his prior strike allegation pursuant to *People v. Superior Court* (*Romero*) 13 Cal.4th 497, 531 and section 1385. The court stated, "In reviewing the *Romero* motion, it is a rather old conviction and [defendant] was rather young at the time, but he has continued to break the law repeatedly from that time up until these very serious convictions. His lack of changing his lifestyle and conducting himself consistent with the law, it did not occur at all during that period of time. Based upon those factors, the Court is going to deny the *Romero* motion." The trial court also denied defendant's request to strike the five-year enhancement pursuant to section 667, subdivision (a), stating "Like I indicated, during trial he repeatedly called one of the victims, urged her not to show up and defy a subpoena that was served upon her as well as telling her to lie. We heard it repeatedly during trial. I don't feel there is mitigation here. In fact, I think it is full of aggravation here." The trial court also stated that it "feels that based on the defendant's conduct both from the -- during his lifetime as well as during trial, he's not deserving of having that stricken."

During sentencing, the trial court recited defendant's criminal history, which included the prior strike conviction that the jury found defendant suffered, as well as 13 misdemeanor convictions. The court imposed the upper term of four years on the dissuading a witness charge in count 3 "based on his multiple convictions and the aggravations of his conduct here," doubled due to defendant's prior strike conviction for

a total of eight years. The court also imposed a consecutive term of 18 months on the attempted corporal injury on a spouse/cohabitant in count 1 (purportedly calculated as one-third the middle term doubled); plus a four-year consecutive term on dissuading a witness from testifying in count 4 (the full middle term, doubled) with an additional five-year consecutive term for the prior serious felony. The court imposed a sentence of 16 months (one-third the midterm, doubled) on attempted false imprisonment by violence in count 2 but stayed it under section 654. Finally, the court imposed a one-year sentence for misdemeanor contempt of court, to be served concurrently.

*B. Analysis*

We agree with the parties that defendant is entitled to retroactive application of the ameliorative changes effected by Senate Bill No. 567 (2021-2022 Reg. Sess.) and Assembly Bill No. 518 (2021-2022 Reg. Sess.). (See *People v. Jones* (2022) 79 Cal.App.5th 37, 45; *In re Estrada* (1965) 63 Cal.2d 740, 742.) We conclude defendant is entitled to a new sentencing hearing in light of these legislative changes.

*1. Senate Bill No. 567 and Section 1170*

In *Cunningham v. California* (2007) 549 U.S. 270, the United States Supreme Court explained the Sixth Amendment to the Federal Constitution "proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Cunningham*, at pp. 274-275.) The court held that the middle term prescribed in California's determinate sentencing law was the statutory maximum. (*Id.* at p. 288.) Subsequently, in *People v. Black* (2007) 41 Cal.4th 799, 816, the California Supreme Court held in relevant part that imposition of the upper term does not violate a defendant's Sixth Amendment jury trial right "so long as one legally sufficient aggravating circumstance has been found to exist by the jury," or "has been admitted by the defendant." A companion case, *People v. Sandoval* (2007) 41 Cal.4th 825,

28

established that the erroneous imposition of an upper term is subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18.

While this appeal was pending, Senate Bill No. 567 (2021-2022 Reg. Sess.) amended section 1170, subdivision (b), providing that a trial court may impose an upper term sentence only where there are aggravating circumstances that justify the imposition of a term exceeding the middle term and the defendant has either stipulated to the facts underlying those circumstances or those facts have been found true beyond a reasonable doubt. (§ 1170, subd. (b)(1)-(2); Stats. 2021, ch. 731, § 1.3, effective Jan. 1, 2022.) In making this determination, the "court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3); Stats. 2021, ch. 731, § 1.3.) "These amendments apply retroactively to [defendant] because his conviction was not final when this legislation took effect." (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.)

Applying the above principles to this case, we find that defendant's Sixth Amendment right to a jury trial on the aggravating circumstances was not violated. We cannot say the same for the statute as amended by Senate Bill No. 567. (See, e.g., *People v. Zabelle* (2022) 80 Cal.App.5th 1098.)

We first conclude that the imposition of the aggravated upper term does not violate defendant's right under the Sixth Amendment to the United States Constitution to have " 'any fact that exposes a defendant to a greater potential sentence . . . found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence.' " (*People v. Sandoval, supra*, 41 Cal.4th at p. 835.) In this case, the trial court concluded that defendant's prior convictions warranted the upper term. As the allegation that defendant had a prior strike was found true by a jury, we have no constitutional concerns with defendant's upper term sentence. (See *People v. Black, supra*, 41 Cal. 4th at p. 812 [as long as a single aggravating circumstance that renders a defendant *eligible* for the upper term sentence has been established in

29

accordance with the requirements of *Apprendi* [*v. New Jersey* (2000) 530 U.S. 466] and its progeny, any additional factfinding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to jury trial].)

While the trial court relied on the facts found true beyond a reasonable doubt by a jury, that is, defendant's behavior in repeatedly calling the victim and "urged her not to show up and defy a subpoena that was served upon her as well as telling her to lie," the court also relied on multiple additional misdemeanor convictions that were not admitted by defendant, proven through certified records of conviction, or found true beyond a reasonable doubt by a jury. (§ 1170, subd. (b).) As such, consideration of these other factors was improper under the newly amended statute.

"When a trial court has abused its discretion in choosing among available sentencing options, such as by relying on an improper sentencing factor, a reviewing court must still affirm unless 'the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) In these situations, the trial court has revealed which sentencing choice it prefers, and the reviewing court must decide whether there is a reasonable probability that the trial court's lawful exercise of discretion on remand will lead it to make a different choice." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 426.)

This requires application of the harmless error test in *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Epps* (2001) 25 Cal.4th 19, 29.) That test is whether, " 'after an examination of the entire cause, including the evidence,' [the reviewing court] is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836; see also Cal. Const., art. VI, § 13; *People v. Zabelle, supra*, 80 Cal.App.5th at pp. 1112-1113.) " 'A "reasonable probability" "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." [Citation.] It "does not mean 'more likely

30

than not,' but merely 'probability sufficient to undermine confidence in the outcome.' " [Citation.]' " (*People v. Rodriguez* (2021) 68 Cal.App.5th 301, 324.)  The *Watson* test "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration."  (*People v. Breverman* (1998) 19 Cal.4th 142, 177.)  Reversal is necessary when there exists "at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result."  (*People v. Watson, supra*, 46 Cal.2d at p. 837; see *People v. Mar* (2002) 28 Cal.4th 1201, 1225.)

As applied here, this requires a two-step analysis.  In the first step of our analysis, we ask whether the facts underlying the improperly determined aggravating circumstances would have been established in a statutorily permissible manner.  (*People v. Watson, supra*, 46 Cal.2d at p. 836; § 1170, subd. (b)(2).)  Under *Watson*, this means we consider the comparative strength and weakness of the evidence supporting a finding of true against the evidence supporting a finding of not true.  (*People v. Breverman, supra*, 19 Cal.4th at p. 177.)  If there is at least "an equal balance of reasonable probabilities" between the two findings, reversal is required.  (*Watson*, at p. 837; *People v. Mower* (2002) 28 Cal.4th 457, 484 [same].)

If the record demonstrates all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error in failing to meet those standards was harmless.  If not, we move to our second step in our analysis. (*People v. Dunn* (2022) 81 Cal.App.5th 394, 410, review granted Oct. 12, 2022, S275655.)  Excluding any factors we cannot conclude would have been found true in a permissible manner, we examine the entire cause to see whether it is reasonably probable that the trial court would have imposed a more favorable result, i.e., a more lenient sentence.  (See *People v. Price* (1991) 1 Cal.4th 324, 492 ["When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a

31

lesser sentence had it known that some of its reasons were improper"], superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165.)  A reasonable probability of a more favorable result exists where the improper factor was determinative for the sentencing court or where the reviewing court cannot determine whether the improper factor was determinative.  (*People v. Avalos* (1984) 37 Cal.3d 216, 233.)

The trial court imposed the upper term on count 3 "based on [defendant's] multiple convictions and the aggravations of his conduct here."  However, as we previously referenced, at the sentencing hearing the trial court recounted defendant's multiple prior misdemeanor convictions, none of which were proven through certified records of conviction, found true beyond a reasonable doubt, or stipulated to by defendant.  (§ 1170, subd. (b).)  As such, after an examination of the record, we cannot determine whether these improperly considered factors were determinative in the trial court's selection of the upper term sentence in this case.  Nor can we conclude that the trial court would have exercised its discretion to impose an upper term sentence based only on the permissible aggravating factors.  Therefore, we find that remand is necessary to allow the trial court to exercise its discretion consistent with the recent amendments to section 1170.

2. *Assembly Bill No. 518 and Section 654*

Another recent enactment, Assembly Bill No. 518 (2021-2022 Reg. Sess.), amended section 654, subdivision (a), to provide in relevant part:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  (Stats. 2021, ch. 441, § 1.)  Previously, under section 654, "the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term.  [Citation.] . . .  [S]ection 654 now provides the trial court with discretion to impose and execute the

sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

"Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. (See *United States v. Tucker* (1972) 404 U.S. 443, 447; *Townsend v. Burke* (1948) 334 U.S. 736, 741.) A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.) In such circumstances, the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." (*Ibid.*; see *People v. Rodriguez* (1998) 17 Cal.4th 253, 257.)

The People argue that the trial court's statements regarding the aggravating factors as well as the imposition of the upper term demonstrate it would not choose a different count upon which to sentence defendant. It is possible that will indeed be the result after a new sentencing hearing. However, given the issues of proof with the factors relied upon to impose the upper term sentences discussed *infra*, we cannot say with requisite certainty that the sentencing calculus will remain unchanged after the new sentencing hearing. Accordingly, we also find that remand is necessary to allow the trial court to exercise its new sentencing discretion under Assembly Bill No. 518 and section 654.

As a final observation, we note the trial court miscalculated the sentence as to count 1, attempted infliction of corporal injury to a spouse/cohabitant. The potential sentencing exposure was 12 months, 18 months and 24 months (half of 2, 3, or 4 years). (§§ 664/273.5, subd. (a).) One-third of the midterm is six months, and doubled due to the prior strike to a term of 12 months. However, because we determine defendant is entitled to the benefits of recent legislative changes, and therefore remand the cause for a new

33

sentencing hearing, the trial court may revisit the term imposed on count 1 at the new sentencing hearing.

## DISPOSITION

We reverse the sentence and remand the matter to the trial court so that it may resentence defendant consistent with amended sections 1170 and 654.  The clerk of the court is directed to issue an amended abstract of judgment following resentencing and to send a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


                                                   /s/
                                              EARL, J.


We concur:


    /s/
DUARTE, Acting P. J.


    /s/
RENNER, J.